IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PRISCILLA ARCHER, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. |
| UNITED TECHNOLOGIES CORPORATION, | § | 3:07-cv-1485-M |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendant United Technologies Corporation's Motion for Summary Judgment [Docket Entry # 19] and Plaintiff Priscilla Archer's Motion for Summary Judgment [Docket Entry # 21]. For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's Motion for Summary Judgment is **DENIED IN PART** and **GRANTED IN PART**. The administrator's decision denying Plaintiff's appeal is **VACATED**, and the appeal is **REMANDED** to Defendant for consideration consistent with this Opinion.

*Factual Background*

Plaintiff Priscilla Archer worked at Forney Corporation, a subsidiary of United Technologies Corporation ("UTC"), from 1974 until 2006. During her employment, Archer was covered under the UTC Choice Integrated Disability Benefits Program ("the Plan"), which includes benefits for sick pay, short term disability ("STD"), and long term disability ("LTD"). The Plan states that it is funded by UTC and administered by CIGNA / Connecticut General Life Insurance Company ("CGLIC") through a contractual agreement.[1] The Plan states that LTD benefits are administered by Life Insurance Company of North America ("LINA"), a subsidiary

---
[1] Administrative Record ("UTC/LINA") at 42-43.

of CIGNA, and that LTD benefits are paid out of a group insurance policy underwritten by LINA. Despite the terms of the Plan, it is apparent from the record that LINA made all the decisions relating to Archer's STD claim, and that LINA was the *de facto* plan administrator.[2] Accordingly, it is LINA's decisions that are analyzed today.

Archer was first diagnosed with narcolepsy in 1967. On May 3, 2006, Archer requested to go on STD because her narcolepsy, which she claimed was getting worse with age, made it difficult for her to work without falling asleep. The STD plan provides, in relevant part:

> You have a covered disability under this integrated sick pay/STD plan if, due to a medical condition related to an accident or illness you meet all of the following conditions:
>
> - You are unable to perform the essential function of your current or similar occupation for more than 5 consecutive scheduled workdays;
>
> - The essential functions that you can't perform cannot be reassigned to another person in order to accommodate your return to work;
>
> - You cannot, based on your lack of work experience or on work restrictions related to your medical condition, be reassigned to another job function;
>
> - Your physician provides medical evidence to support his or her assessment of your medical condition.

Archer was provisionally awarded STD while her claim was pending. Over the following months, LINA case manager Kathleen Norbert conducted a multi-step review of Archer's claim. The investigation first considered the opinion of Archer's physician, Dr. Gustavo Day, who stated that during a physical, Archer complained of worsening narcolepsy. Norbert was dissatisfied with the opinion because she felt Dr. Day did not provide sufficient medical evidence showing that Archer had disabling narcolepsy, as required by the STD portion of the Plan.

---

[2] *See* UTC/LINA at 414 (Kathleen Norbert), at 506 (Dr. Scott Taylor), at 436A (Denial Letter), at 112 (Scott Hornung), at 117 (Dr. John Mendez), and at 113-115 (Letter Denying Appeal). *See Sosa v. Life Ins. Co. of North America*, No. Civ.A. 00-0934, 2001 WL 13338 (E.D. La., January 4, 2001) (declaring LINA *de facto* plan administrator when clear it made decisions in contravention of plan's terms).

Norbert then reviewed emails from one of Archer's co-workers, who stated that she had observed many times that Archer involuntarily fell asleep at work. Norbert scheduled a "peer-to-peer review" between Dr. Day and Dr. Scott Taylor, a LINA medical director, to discuss Archer's condition. Dr. Taylor concluded that Archer had not provided sufficient evidence of the limitations described by Dr. Day. Dr. Taylor reported that:

> 7/24/06 14:28 CST. 1st call to Dr. Gustavo Day (Internal Medicine) at 972-566-6764. He said that he filled out the paperwork for the disability claim based upon the claimant [sic] request to go on disability because she was having problems staying awake at work and driving her car to work. He says she had been reporting she was under good control and thus he continued to give her 200 mg of Provigil every day. He said there has been no recent changes in her treatment for the narcolepsy or for the obstructive sleep Apnea. I asked the Dr if any evaluation of the quantity of sleepiness like an Epworth Sleepiness Scale [sic] but he said it was only based upon what she told him. Dr Day says the claimant has not had any type of medical work-up for her narcolepsy or OSA in quite some time. He said he guessed she would probably be in soon if her request for disability is turned down and he will do up-date testing if she desires . . . .
>
> There is no update [sic] clinically measurable testing like a polysomnogram or Sleep Latency Testing. There is no evaluation for severity of sleepiness like an Epworth Sleepiness Scale. Sufficient documentation is not found in the file that severity of condition exists to support the L&Rs [limitations and restrictions] given by the attending physician. Sufficient documentation is not found in the file that clinically measurable deficits exist to support the L&Rs given by the attending physician. In absence of such documentation, I do not believe the documentation supports the L&Rs.

Norbert informed Archer that she would be required to undergo an Independent Medical Exam ("IME"), which included a Functional Capacity Exam ("FCE"), to provide concrete documentation of her physical limitations. Dr. Wright Singleton, an independent doctor specializing in occupational medicine, performed the IME. His report diagnosed Archer as having narcolepsy, but stated that "[t]he restrictions for this individual would be based on the subjective symptom of narcolepsy." In response to a question asking him to describe Archer's ability to perform her job duties in light of her symptoms, he stated:

> She desires to completely stop working at this time. Narcolepsy in this case can cause boughts [sic] of emotionally induced sleep but nothing in the literature mentions worsening of the condition with age. Ms[.] Archer does not have cataplexy and mentioned very few episodes of sleep. Her main concern was a worsening with age but to my knowledge this does not occur . . .

Singleton filled out a chart documenting Archer's physical abilities, and found that she could perform activities such as sitting, standing, walking, and sedentary functions for five or more hours. Singleton wrote that while Archer "sited [sic] progressive symptoms occurring at work interfering with driving to work and interfering with her performance . . . she occupies a light duty job and has no complaints of physically being able to handle her job at this time." Under the "symptoms" section, he stated that Archer was "without physical complaints."

Norbert concluded that neither Archer's medical records nor the IME / FCE provided sufficient medical evidence that Archer was disabled under the STD part of the Plan. On September 22, 2006, Norbert informed Archer that her claim was denied. Norbert cited the lack of clinical or diagnostic tests to support Archer's claim that her narcolepsy had worsened to the point of complete disability, and noted that Dr. Day stated that his assessment was based on the symptoms Archer herself reported to Dr. Day. She described the result of the FCE as stating that Archer was capable of performing sedentary work, the type of work Archer performed as a payroll administrator.

On January 26, 2007, Archer administratively appealed the denial. With her appeal, Archer included the results of a "sleep study" performed by Dr. Fish Greenfield, a board certified neurologist, on September 29-30, 2006. The sleep study was performed in two parts: a polysomnogram followed by a multi-stage sleep latency test ("MSLT"). The polysomnogram is taken the night before a MSLT, and allows doctors to measure the quality of a patient's sleep.

4

The MSLT measures how sleepy the patient is during her waking hours. The tests are used in sequence to ensure that the MSLT results are not skewed by the patient getting poor quality sleep the night before. In other words, a person without narcolepsy could "fail" a MSLT if she slept restlessly (or not at all) the night before, and the polysomnogram is used to ensure that a proper baseline is achieved before the MSLT is performed. According to Dr. Greenfield, Archer's polysomnogram showed that she had sufficient sleep for the MSLT to be given the next day. It showed "significant hypersomnolence."[3] This was despite the fact that, on the day of the MSLT, Archer mistakenly took 200mg of a medicine called Provigil, a drug designed to treat narcolepsy. She was not supposed to take Provigil before the MSLT, because the test was intended to assess the state of Archer's condition without medication. Given that Archer's symptoms were present even thought she took Provigil, Dr. Greenfield concluded that it was "unsafe for her to drive and obvious that she would not be able to be employed in her current condition." Dr. Greenfield stated that Archer had "disabling narcolepsy."

LINA assigned the appeal to Dr. John Mendez, one of LINA's Associate Medical Directors. Dr. Mendez assessed the appeal as follows:

> Based on the additional provided medical records, the original assessment remains unchanged because, despite documentation of an illness that Ms. Archer has had since age 14, and subjective complaints of excessive daytime sleepiness and fatigue, *there remains no documentation of significant measured physical, cognitive or psychological limitations* to support her claim that she remains unable to return to her regular work duties from 8/31/06 to the present. (Emphasis added).

This "no documentation" conclusion was made in spite of the MSLT results and Dr. Greenfield's conclusion and diagnosis. Based on Dr. Mendez's assessment, LINA affirmed the denial of Archer's benefits, stating that her "functional capacity from either a physical, cognitive, or psychological aspect" did not prevent her from performing her duties at work. On August 30,

---

[3] While the parties have not provided a medical definition of hypersomnolence, the parties both treat the term as having its natural meaning, which is a heightened level of sleepiness.

2007, Archer filed this lawsuit, claiming a violation of the Employee Retirement Income Security Act ("ERISA").

*Legal Standard*

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the facts and law, as reflected in the pleadings, affidavits and other summary judgment evidence, show that no reasonable trier of fact could find for the nonmoving party as to any material fact.[4] "The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but is not required to negate elements of the nonmoving party's case."[5] Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate by demonstrating the existence of a question of material fact.[6]

Where, as here, a STD plan administrator has "discretionary authority to determine eligibility for benefits and to construe the terms of the plan," the court reviews an administrator's decision for an abuse of discretion.[7] Under this standard, "if the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail."[8] Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9] Conversely, "[a]n arbitrary decision is one made without a rational connection between the known facts and the decision or between the found facts and the evidence."[10]

In *Corry v. Liberty Life Assurance Co. of Boston,* the Fifth Circuit highlighted the

---

[4] *See* Fed. R. Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).
[5] *Lynch Props, Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322–25).
[6] *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).
[7] *Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 397 (5th Cir. 2007).
[8] *See Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 273 (5th Cir. 2004).
[9] *Id.*
[10] *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996).

difficult burden faced by an ERISA plaintiff, explaining that the "substantial evidence" standard is used because the task of weighing conflicting evidence is to be left largely to the administrator rather than the courts.[11] In *Corry*, three of the defendant administrator's consulting physicians could identify no objective or clinical reasons for the plaintiff's pain, while two of plaintiff's treating doctors concluded the plaintiff was disabled and unable to work.[12] In granting the administrator's motion for summary judgment, the Fifth Circuit noted that although there was evidence that the plaintiff was unable to work, substantial evidence supported the administrator's decision to deny the plaintiff's benefits.[13] The Fifth Circuit held that a "claim that the administrator was arbitrary and capricious in failing to consider and give proper weight to relevant evidence must be rejected" if such evidence was countered by substantial evidence to the contrary.[14]

However, an administrator's decision is afforded less deference when the administrator is subject to a conflict of interest. In *Metropolitan Life Insurance Co. v. Glenn*,[15] the Supreme Court held that when the administrator responsible for evaluating claims also would have to pay the resulting benefits, a conflict exists.[16] The Court declined to establish any "one-size-fits-all procedural system" to determine how to weigh the significance of this conflict, and instructed that a district court should consider the conflict as a factor in deciding whether a plan administrator abused its discretion, with the weight of the factor depending upon the circumstances of each case. Despite this open-ended prescription, the Court did provide some examples of how certain situations should affect a district court's review. The Court stated that a

---

[11] 499 F.3d at 397 (5th Cir. 2007).
[12] *Id*. at 395-99.
[13] *Id*. at 401.
[14] *Id*.
[15] 128 S.Ct. 2343 (2008).
[16] *Id*. at 2346-51. *Accord Vega v. Natl'l Life Ins. Serv., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc) (establishing "sliding scale" test in which deference due to administrator depends on extent of conflict of interest).

conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration."[17] The Court approved of the Sixth Circuit's weighing of several factors that, taken together, amounted to an abuse of discretion: In *Glenn*, the administrator had encouraged the claimant to argue to the Social Security Administration that she could do no work (in order to obtain Social Security benefits and an offset against the amount of disability benefits to which the claimant was entitled), and then after the Social Security Administration agreed with the claimant's position, the administrator ignored that determination and claimed that she in fact could do sedentary work. This was evidence of a conflict because the administrator took two inconsistent positions when each was in its financial interest. In addition, the Sixth Circuit found significant the fact that the administrator had emphasized a medical report supporting a denial of benefits, while it deemphasized other reports that supported granting them. Finally, the administrator failed to provide its independent vocational and medical experts with all the relevant evidence. The Supreme Court concluded: "All these serious concerns, taken together with some degree of conflicting interests on [the administrator's] part, led the court to set aside [the administrator's] decision. We can find nothing improper in the way in which the court conducted its review."[18]

     Under ERISA, employee benefit plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary on the decision denying the claim."[19] The Department of Labor requires a plan to follow certain procedures when reviewing a denial of benefits in order to provide a claimant

---

[17] *Id.* at 2351.
[18] *Id.* at 2352.
[19] 29 U.S.C. § 1133(2) (1974).

with a full and fair review of an adverse benefit determination.[20] One such requirement is that when deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, the plan administrator must consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment.[21]

*Analysis*

**A.     Archer's Motion for Summary Judgment**

Under Federal Rule of Civil Procedure 56, Archer has the burden of proving the absence of genuine issues of material fact as to whether LINA abused its discretion in denying Archer's claim.

1. LINA's review of Archer's STD claim

The Court first addresses Archer's claim that the Court should give less deference to the administrator's decision to deny her STD claim. Archer argues that LINA was conflicted because if it determined that Archer is entitled to STD benefits, it would likely also have to pay her LTD benefits because it insures such benefits. The Court agrees that these facts present the potential for a conflict of interest. Under Fifth Circuit precedent, the more evidence of conflict on the part of the administrator, the less deference it is entitled to on review.[22] However, when a plaintiff submits only the minimal basis for a conflict but presents no evidence as to the degree of that conflict, the administrator is entitled to only a modicum less deference than normal.[23]

Archer first argues that LINA abused its discretion because LINA had no concrete evidence for its decision, and as a result there is no rational connection between the administrative record and the final decision to deny Archer's STD benefits. However, the record

---

[20] 29 C.F.R. § 2560.503-1(h)(4).
[21] 29 C.F.R. § 2560.503-1(h)(3)(iii).
[22] *See Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 297 (5th Cir. 1999).
[23] *Id*. at 301.

9

shows that LINA acted on substantial evidence in making its initial denial. LINA reviewed Archer's relevant medical records and concluded that Archer had not properly documented her disability with objective medical evidence as required by the Plan. At the time of her claim, Archer had not submitted any objective evidence that showed that a disease from which Archer suffered for thirty years had recently worsened to the point where she was completely disabled. LINA then arranged a peer-to-peer review between Dr. Day and Dr. Taylor; Dr. Taylor noted that Dr. Day filled out the paperwork for the disability claim based on Archer's request, and Dr. Taylor noted that Dr. Day stated that there had been no recent changes in Archer's treatment for narcolepsy or for obstructive sleep apnea. Dr. Taylor concluded that there was insufficient documentation of the severity of Archer's condition to substantiate Dr. Day's opinion. Thus, the peer-to-peer review did not provide the objective evidence LINA was seeking. In addition, LINA had Dr. Wright Singleton, an independent physician, review Archer's records and perform a FCE. Dr. Singleton concluded that Archer could tolerate the activities required for her occupation for five and a half or more hours at a time. Dr. Singleton concluded that any restrictions attributable to Archer's condition were based on her subjective account of her narcolepsy, and that no physical limitations were necessitated by Archer's medical complaint.

Archer makes much of Dr. Day's opinion that she could not work because of advanced narcolepsy,[24] and argues that LINA was incorrect to credit the opinions of the other doctors, such as Dr. Singleton, over that of Dr. Day. However, treating physicians are not accorded special deference in disability determinations. In *Black & Decker Disability Plan v. Nord*, the Supreme Court stated that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on a plan's administrators a discrete burden of explanation when they credit reliable evidence that conflicts

---

[24] UTC/LINA at 0477.

10

with a treating physician's evaluations."[25] Dr. Day is only one of several physicians who reviewed Archer's case, and LINA was entitled to weigh his opinion against those of the other doctors.

Archer also makes several arguments essentially claiming that UTC's denial of STD was incorrect; she claims that Dr. Singleton erred in his diagnosis, that he was not provided with an email from Archer's co-worker documenting her falling asleep at work, and that he attributed statements to Archer that she did not in fact make. None of Archer's arguments, even taken as true, establish that UTC lacked concrete evidence to support its initial denial, and this Court cannot hold that no concrete evidence existed merely because some of Dr. Singleton's conclusions may be inconsistent with other evidence in the record.

In sum, LINA was entitled to weigh the competing evidence in arriving at its benefit determination, and the Court finds that LINA's actions in reviewing Archer's initial claim did not amount to an abuse of discretion even when giving less deference than would be afforded the administrator without a conflict of interest.

2. LINA's Review of Archer's Administrative Appeal

Archer also advances several arguments as to why LINA's denial of her administrative appeal constitutes an abuse of discretion. Archer argues that LINA cannot deny her appeal in the absence of consulting a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment. Archer contends that Dr. Mendez, the reviewing physician, is not "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment," as is required by 29 C.F.R. Section 2560.503-1(h)(3)(iii), because narcolepsy is a neurological disorder and there is no evidence that Dr. Mendez is a neurologist or has any experience with narcolepsy. In response

---

[25] 538 U.S. 822, 834 (2003).

to a letter objecting to Dr. Mendez's qualifications, Scott Hornung, a LINA Appeals Claim Manager, stated, with no elaboration, that in "adjudicating Ms[.] Archer's short-term disability appeal utilizing Dr. Mendez['s] expertise constituted an appropriate medical review of the clinical evidence provided for appellate consideration."[26]

The Court agrees that the denial of Archer's appeal under these circumstances constitutes an abuse of discretion. The Fifth Circuit recently addressed a similar issue in *Bernardo v. American Airlines Inc.*[27] In *Bernardo*, the plaintiff suffered from aplastic anemia, a blood disorder, as well as neurological side effects from cyclosporine A, a drug she was given to treat the disorder. While several doctors presented evidence that her blood disorder had gone into remission, and was thus no longer disabling, there was evidence that the side effects from the cyclosporine A also caused plaintiff to be permanently disabled. Without having the plaintiff's cyclosporine A side effects evaluated by a neurologist, the plan denied her benefits, stating that "the information presented in support of plaintiff's claim no longer substantiates her inability to perform her occupational duties." The Fifth Circuit held that the denial "did not reflect a rational connection between the known facts and the decision to deny benefits," because there was an "unexplained gap" between the evidence showing continued disability and the denial letter. There is a similar "unexplained gap" in the instant case, where Dr. Mendez's "no documentation" conclusion seemingly ignores Dr. Greenfield's report that showed Archer had suffered from narcolepsy even when treated with anti-sleeping medication, and his conclusion that Archer's narcolepsy was disabling.

The evidence leads the Court to question whether Dr. Mendez, who is not a board certified neurologist, has appropriate training and expertise in the field of neurology so as to give

---

[26] UTC/LINA at 0101.
[27] No. 07-20900, 2008 WL 4657080 (5th Cir. Oct. 22, 2008).

a fair and full review of Archer's appeal.  While the Fifth Circuit has not directly addressed what circumstances require a specialist to review an ERISA appeal, several district courts have addressed similar factual situations.  In *Robinson v. Metro. Life Insurance Co.*, the court held that, when a patient complained of neurological disorders, a review of her symptoms by a pulmonary specialist was insufficient to satisfy 29 C.F.R. Section 2560.503-1(h)(4). [28]  Since most of the plaintiff's serious symptoms were neurological, the court ordered the defendant to refer her case to a neurologist in order to give the plaintiff a "full and fair review of her claim." Similarly, in *Dirkes v. Hartford Life Group Insurance Co.*, a district court held that, where the plaintiff's disability stemmed from liver problems, a review by a liver specialist was required for a proper review of her appeal.[29]

Here, on appeal, Archer provided LINA with new evidence, which included objective tests performed by Dr. Greenfield, a neurologist, as well as his diagnosis of disabling narcolepsy. Notably, Dr. Taylor, the LINA doctor assigned to perform a peer-to-peer review early in the STD claim process, cited Archer's lack of an MSLT and polysomnogram as part of her failure to provide objective medical evidence of her condition, and those were the exact tests that Archer provided with her appeal.   LINA then had Dr. Mendez, who is not a neurologist, review Archer's appeal, and subsequently denied her appeal based on Dr. Mendez's findings.  Despite having Dr. Greenfield's conclusion and diagnosis, Dr. Mendez found that there is "no documentation of significant measured physical, cognitive, or psychological limitations to support her claim that she remains unable to return to her regular work duties," without analyzing why the test results and Dr. Greenfield's conclusions and diagnosis did not constitute evidence of such limitations.

---

[28] No. 05-Civ 1534(LLS), 2006 WL 1317019, at *2 (S.D.N.Y. May 12, 2006).
[29] No. 1:05-CV-254, 2008 WL 2788059, at *9-13 (S.D. Ohio July 15, 2008).

While the Court does not believe that LINA's unreasonableness towards Archer's appeal necessarily means that it was tainted by a conflict of interest in making its initial denial, the fact that objective evidence was asked for and then seemingly disregarded when provided constitutes an abuse of discretion. LINA must comply with all the terms of ERISA and properly evaluate Archer's appeal, including submitting all the materials included with Archer's appeal to a doctor who is either a neurologist or has experience with narcolepsy, for independent review. After LINA reconsiders Archer's appeal in light of all the evidence, if the issue again returns to this Court, the Court will reexamine the appeals process to ensure strict compliance with the law. LINA's denial of Archer is **VACATED** and **REMANDED** for reconsideration consistent with the terms of this Opinion.

3. Archer's Claim for LTD is Premature

Archer moves the Court to award her Long Term Disability benefits under the LTD plan. The LTD Plan states that an employee will be paid long term disability benefits only after STD benefits are exhausted, and only to those employees who continue to be disabled for longer than 26 weeks. Additionally, the terms governing LTD benefits are different from those governing STD benefits. For LTD, the employee must be "unable to perform all the material duties of any occupation," whereas for STD it is only his or her *current* occupation that is analyzed. Since UTC did not abuse its discretion in its initial denial of Archer's STD claim, which occurred before Archer had exhausted 26 weeks of STD benefits, and the Court has no record of whether Archer, given her condition, is qualified to perform any job, it would be inappropriate for the Court to now order any action regarding the LTD benefits. To the extent Archer now seeks an award of long term disability benefits, her Motion is **DENIED** without prejudice to her seeking such benefits from UTC.

**B.     UTC's Motion for Summary Judgment**

For the reasons stated above, UTC did not abuse its discretion by denying Archer's STD claim. To that extent, UTC's Motion for Summary Judgment is **GRANTED**. To the extent that UTC moves the Court to remand the LTD claim to it for evaluation consistent with the terms of the Plan, the Motion is **GRANTED**. UTC's Motion is otherwise **DENIED**.

*Conclusion*

LINA's initial denial of Archer's claim for STD was properly supported by substantial evidence, but its behavior when denying her appeal constituted an abuse of discretion. To the extent that Archer moves for a reconsideration of her appeal, her Motion is **GRANTED**; otherwise it is **DENIED**. LINA's denial of Archer's appeal for STD benefits is **VACATED** and **REMANDED** to LINA for reconsideration by a neurologist or other specialist in narcolepsy.[30] UTC's Motion for Summary Judgment on its initial denial of STD is **GRANTED**, and to the extent UTC moves the Court to remand its LTD determination for future review, its Motion is **GRANTED**, and otherwise **DENIED**.

**SO ORDERED**.

March 3, 2009.

*[signature]*
BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
**NORTHERN DISTRICT OF TEXAS**

---

[30] *See Moller v. El Campo Aluminum Co.*, 97 F.3d 85, 88-89 (5th Cir. 1996) (remanding to plan to consider new evidence when evidence insufficient for full and fair review); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 n.7 (5th Cir. 1994) (remanding to plan administrator with instructions to consider additional evidence is proper relief for insufficient administrative record).